The third case this morning is Gaetjens v. Winnebago County. Good morning, Your Honor. May it please the Court? I'm Andrew Finca on behalf of Gaetjens v. Winnebago County. Mr. Drinkwine? Are you ready to proceed, Mr. Drinkwine? Did you want me to go, Judge? No, no, I said are you ready to proceed? Oh, yes, I am, Your Honor. All right. Okay, Mr. Finca. You may proceed. Mr. Duhuel, you're here too. May it please the Court? The facts on appeal, and in this case, may appear ridiculous or particularly strange, but they are scary and very serious. There are three separate events that plaintiff contends violated her Fourth Amendment rights in this case. The first was Defendant Alton's warrantless seizure, or sorry, warrantless entry into her home. The second was Defendant Foley's warrantless seizure of her home through condemnation, and the third was the warrantless seizure of her cats. For each of these events, the District Court improperly credited defendants' version of the Dispute of Material Facts and ignored the fact that they had fairly, they had failed to properly present their qualified immunity argument. As a result, the Court erred in granting summary judgment for the defendants on the basis of qualified immunity. Furthermore, also on appeal, plaintiff is challenging the grant of summary judgment on the Manal liability claim for both the city and the county, where it failed to, it specifically declined to reach the mayors of the argument under prong one of the qualified immunity test. In this case, it stated that because it had found the, it had found or made a finding regarding an absence of any constitutional violation, that the plaintiff's Manal theory also failed. And finally, the final issue that was, that is on, that is up on her appeal is that the Court erred in granting summary judgments to a spontane favor of the remaining county defendants without providing plaintiff with a meaningful opportunity to develop the record on review. In this case, it's, I think it's especially important to note what was available and what information was available to the officers at each and any of the government agents at each point in plaintiff's house or her cats. Defendant Alton initially, when he arrived on the scene, stated that, or the facts show that the only reason that he believed he had the authority to search plaintiff's house was that the neighbor, Rosalie Eads, had given him a key. This is the sole or had the apparent authority to consent to the search. In fact, Eads specific, and this is an important disputed fact that needed to be, that is dispositive even. Mr. Figge, I know where you're going with this. I'm interested in this actually, but maybe for a different reason. You argue that the district court sort of ignored that Ms. Eads begged the officers not to enter the home and asked her to check the Rockford home. What difference does that make? Why is that material at all? Given the other facts, she calls and asks for a well-being check, there's garbage, and the mail hasn't been picked up. I mean, it seems to me to have all the hallmarks of going into the house for a well-being check under exigent circumstances. What difference does it make if she said, no, you, I don't want you to go in there? Is the officer just supposed to say, oh, okay, in that case, forget the call. I think that's, your honor, is focused on the crux of the issue here, which is that if officers don't have a reasonable, don't have enough information in order to show that there was an emergency justifying the search of this house, they have a duty to undertake an investigation to determine, you know, to find additional facts showing that the plaintiff was actually in this house as opposed to the Rockford place. Eads had said that she had been watching the house all day, that she didn't believe that the plaintiff was in her Love's Park house, that she was instead at her Rockford house. Eads' testimony was that she begged them initially before they even conducted the search to take her to the Rockford house to search that she was there because she'd been watching that entire day. Officers, I agree that there is, it's a closer issue, especially, and is dispositive that qualified at immunity if the surrounding facts may have been enough to show that she was actually in that house at the time. And this was her only residence. And this is the only residence that Eads believed that she was at. But Eads is the sole piece of information that the officers, sole source of information that the officers could have relied on or did, sorry, asked the plaintiff's whereabouts and the nature of the emergency. There are any number of other steps. I have a practical question for you, maybe it's not in the record, but why did Ms. Eads call the police? Eads called the police because she had... She got the call from the doctor. The night before she got the call from the doctor, the doctor said that... And then she hadn't seen her neighbor and she was worried. And so when the next day, when Eads hadn't seen her neighbor and she was worried, again, the doctor gave no specifics regarding any nature of emergency, just told her to tell plaintiff to call her doctor that evening, the evening before on December 4th. December 5th, sometime in the mid-afternoon, I believe it was around 3 or 3.15 or so, Eads calls the... Returns the call from the number that she received the night before to the doctor and says that she's concerned because she hasn't seen plaintiff all day. They say that... And she wanted to know whether or not they had managed to get in touch with the plaintiff. The doctor said that... And they say, we're not going to tell you. They say, we can't tell you that because of privacy violations. And they say... And Eads is clearly concerned at this point. And it appears that from the record that whoever it was at the Perryville Clinic told her that, well, if you're so concerned, you can call the police and essentially made it the police's problem or made Eads... Right, right. I agree with you there. That's why she called. I agree with you. And then the police dealt with it in the manner in which they saw fit by sort of telling Ms. Eads, we appreciate the fact that you don't want us to go into the house, but based upon all these facts and circumstances that we see, we think we should go into the house and make sure that she's okay if she's there. The key isn't that she didn't want them to go into the house. It's that she didn't think she was in the house. She thought that she was in the Brockford house because of what she had viewed that day. And she related this to the police officers. So... Well, she wasn't sure. So what's the difference? Why should the police not go in then? Well, because of the... She had an idea that she wasn't there? Yes. She believed that she wasn't there. She hadn't seen... She'd seen the plaintiff enter or leave the entire day. What about the garbage, the mail, and all the other incidents? Well, that was the garbage day. So her garbage hadn't been taken out that day. The mail, she hadn't actually looked inside the mailbox to determine whether or not there was any mail there. I think it was just as simply that there was a package on the front door. All of those things are consistent with the fact that she may have not been in the house, not that she was in the house requiring emergency aid. So that's why the doctor called her? So the doctor called her because she had decided to go home instead of directly going to the hospital. And she told the doctor that she wanted to... If you were a policeman under the circumstances, would you have gone in? If I was a policeman under those circumstances and she was begging me to go to her other house because she believed that she was on the other house, I don't believe that I would have... And I thought it was an emergency. I would have gone where the person who told me the emergency, who gave me the information regarding the emergency, where they believe the plaintiff to be. And in this case, it wasn't in the Loves Park house. And furthermore, I would have attempted there any number of things she could have done. I don't think, Mr. Finke, with all respect, you're being fair to Ms. Eads' testimony. Okay? We don't have to guess it was what Ms. Eads thought. She testified under oath about what she thought. And she testified that she believed that her neighbor was experiencing a medical emergency. She wanted help from the police department. And she simultaneously told them, I think she may well be in Rockford. So how does that violate any aspect of the Fourth Amendment for the police department to act upon that information? I'm not even sure you're even close to a prong one violation. Because they didn't act on that information. They went to the Loves Park house. They went in the house. They acted on it. They were told there was a medical emergency. Sergeant Alton entered the home. He received backup assistance from the fire department. They did not find her. They acted on it. As Your Honor said, she said that she believed that she was in the Rockford house, not in the Loves Park house. It doesn't negate the statements that she was making about a medical emergency. That's the part of this that really is attenuated. I understand, Your Honor. And we're not saying that there wasn't, that she didn't have, or they didn't believe that an emergency existed. It's just that it wasn't in this house. It was an obvious constitutional violation. We think that it's an obvious constitutional violation if they don't have a reason to believe that there's a person in need of medical care inside that house and instead went, you know, instead ignored it. So this in your view is like Hope v. Peltzer or Taylor v. Riojas. Blatant constitutional violations equivalent to hitching or tying a prisoner to a hitching post and exposing him to sun for 12 or 14 hours for a petty violation in the prison or requiring an inmate to live in sewage for an extensive period of time. I don't believe that those facts are directly on point. Those are all those, those cases. I think I want to try to answer my question. The answer is no. If, if, if I, we're not saying that I believe that the, that the facts in this case are similar to the facts in Hope v. Peltzer. What I'm saying is that I think the contours of the clearly established right are significantly more established here, which is that there is a per se, weren't the per se prohibition against warrantless searches of a residence. And in this case, they didn't have, if plaintiff had 15 hours. That's actually not accurate. It's not even close to accurate. Okay. But go ahead. There's an exigent circumstances to the, there's an exigent circumstances exception that many justices were emphasizing over and over again in the separate writings in the opinion that came out two weeks ago or a week ago, Coniglia v. Strom. Yep. And I, I understand your honor is referring to the concurrences in Coniglia. Yes. Yes. And, and, and again, our, so there, there are several ways to distinguish that here, here in Coniglia, they indicate it was significant to them that it would be a 911 or emergency call, which in this case that the record doesn't reflect that, that, that occurred. But I believe that, that judge or Justice Kirch's point here is, is crucial is that there, there has to be knowledge that they were, that she was actually in this house. And on that point, I believe that Mason v. Green City side of, in our reply is on point. There, the court faulted police officers attempts. There, the police actually took more efforts in, in investigating the, the allegations of emergency by actually attempting to call the plaintiff. Here, they could have done that. They could have called, they had the information for, for her doctors. They could have easily called the doctors to determine whether or not there was emergency. And furthermore, in this case, if there was an emergency that actually required them to. By the way, I'm not, I'm not sure that's true. I'm not sure the doctors can just provide information to the police just based over the phone. Well, the police would have at least been able to attempt to call them is, is my point, Your Honor. And they would have found the same thing Ms. Reed's found, nothing. I mean, I just, Mr. Finke, I, I can't help but smile thinking about all these things the police should have done if your client was in the house suffering a medical emergency. Well, they ran to the Rockford house and they stopped at Jewel. Then they called the doctor all the while looking at the packages on the front door, the garbage, the neighbor's phone call. I mean, I think we'd be here on the flip side and we, it, it, anyway, I'm having a hard time with that. And again, our argument is solely that she specifically said that she didn't believe that she was, that plaintiff was in that house. But she didn't know. She didn't know. And they made no effort. She called 911 to report a medical emergency. A fact that she didn't call 911. That isn't in the record. So I called the police department to report a medical emergency. That's undisputed. She called the police department to state that she hadn't been able to contact the plaintiff after being contacted by the doctor. If there's, if there are no further questions, there are the other two issues in this case, which even if there was a, even if the initial search was justified, that doesn't justify the condemnation of the house or the seizure of the cats. I have 30 seconds. So I will, I will reserve my remaining time. Thank you, Mr. Fink. Thank you, Your Honor. Ms. Triello? May it please the court. My name is Jennifer Triello and I represent Sergeant Alton, Police, Fire Chief Foley, and the City of Loves Park in this case. Qualified immunity applies here because Plaintiff dealt right. Ms. Triello, I have a question for you. I really only have one question for you, and that is, and maybe you can't answer this, but why do we have two red briefs in this case? In this case, you know, there's, we asked for consolidated briefs and there's a lot of repetition and we have two in this case. And I'm just curious as to if there's something I'm missing. I think one of the reasons, Judge, is that there is an issue with the fact that the county defendants did not file any paper in the district court. Okay, all right, all right. That's good enough. That's good. Okay, that would be my reason. But qualified immunity applies based on either prong here. Plaintiff's right was not clearly established due to lack of precedential notice. And even here today at argument, we're seeing a focus on fact, an effort to create issues of material fact that quite frankly don't exist. The quest below from the plaintiff's camp was to convince the district court that a home filled with 37 cats, 32 litter boxes that hadn't been attended to in two to three days, no litter in the boxes, nothing to absorb odor, male cats spraying everywhere, was the epitome of spick and span. That was the effort here. And it really didn't go to the qualified immunity analysis at all. So what we're missing is the citation of analogous case law that would have put my clients on notice that what they were doing was violative of the Fourth Amendment. Do we even have to get there? Do we even have to get there in this case? It would have made it a lot easier if we just would have decided it on the first prong. But we can do that, right? We can do that. We can decide on the first one. If we go to the, if we decided on the first prong, I think we can affirm the district court judge's Monell decision because he decided there was no claim. He decided there was no constitutional violation. So Monell didn't apply. But if we decided on the second prong, what do we do with the Monell claim? Monell can still be dismissed. Our summary judgment could still apply to the particular Monell claim that plaintiff is trying to assert here, which is an official policymaker type claim that that fire chief Foley and what he did constitutes the official policy of the city. And that if fire chief Foley wouldn't have known that he was violating a clearly established right, then it makes no sense to suggest that the municipality through its policy, through chief Foley, wouldn't be acting deliberately indifferent to clearly established rights. And we've cited in our brief cases where even though the analysis was limited to the second prong of qualified immunity, the Monell claim still fell. And council was quick to point out in the reply brief that was filed yesterday that, well, those are all failure to train cases. But our argument was, and one that wasn't responded to by council, is that the analysis carries over. It doesn't make any sense for the type of Monell claim that's being asserted here. And we would suggest there's enough in the district court order that the district court did actually rule as to prong one. You know, it's there. It's stated several times that I found no constitutional violation. You've got a rough go of it, plaintiff. This isn't going to happen, even as to prong one. So, you know, that's, I hope that answers your question, Judge, relative to Monell. That's our position. You know, as I was saying, there's been such a focus on the fact and the facts, many of which, and I think one of the judges here talked today about not being fair to Rosalie Eade's testimony. I think that was you, Judge Scudder. That's putting it very politely. I think Mr. Finca is absolutely right to focus on her testimony. That's the linchpin of it. He is clearly correct and doing a good job for his client to focus on it. But you've got to focus on it in its entirety. And what she said is reporting a medical emergency. I agree, and not that she didn't have any knowledge of what, it wasn't that the clinic called and didn't advise. The clinic told her there is a medical emergency involving plaintiff. It wasn't just have her call the clinic. That's not the testimony of record. Or her prescription is ready at Walgreens. Correct, correct. And then we see some misdirect and focus on whether or not Rosalie Eade's called 911 or called the non-emergency number. It doesn't matter at the end of the day because it's undisputed that she called and asked for the well-being check. And in fact, her testimony was that she thinks she did call 911 on the day in question. And that's on pages 51 and page 119 of her deposition. So she did call 911. She thinks that's what she called. That is in the record. But at the end of the day, it doesn't matter. There was certainly enough circumstances as the courts already discussed this morning for Officer Sergeant Alton to think that there was an emergency and that it merited going inside her home and searching for her. Where the condemnation is concerned, plaintiff has a real laborious task of trying to show that that was unreasonable. And plaintiff's just not up to that task based on the facts of record here. It's about more than just that Fire Chief Foley got a whiff of cat pee from standing outside the door. He talked to Alton who had been in the house. He knew that Alton couldn't go more than 10 steps in the house without succumbing to this odor that was described as a mix of urine, feces, and possibly a decomposed body. Fire Chief Foley described the smell as being one that would gag a maggot and his assessment that the home should not have been inhabited by animal or humans was spot on and reasonable. And there was nothing unreasonable and no case law would have told him it was unreasonable and you're going to violate her Fourth Amendment rights if you condemn the home. I see my time is up. I thank you very much, Your Honors. Thank you, Counsel. Mr. Drinkwine. Thank you, Your Honor. May it please the Court. I'm Chris Drinkwine for the County of Winnebago and Winnebago County Animal Services Officers Jennifer Stacey, Dave Caskey, and Dashdell Rio. The County defendants respectfully maintain that the District Court's order granting summary judgment on all four or all three of plaintiff's Fourth Amendment claims can be readily affirmed on prong two of the qualified immunity analysis and therefore we would urge the Court to consider the prong one basis for dismissal of the third Fourth Amendment claim which is directed at the County defendants. In particular, we've advanced two bases why there was no Fourth Amendment violation when the County defendants entered the house in order to rescue the cats. The first of those is that there was no expectation of privacy in the house after Chief Foley entered the condemnation order. While this Court has never held that a property owner loses expectation of privacy based on a condemnation order, the Sixth and the Eighth Circuits have. In the United States v. Washington and cross v. Mochla cases respectively and obviously if there's no expectation of privacy at the time that County defendants entered there's no Fourth Amendment violation. We would also like to point out your honors that obviously our primary contention is that the condemnation order was lawful but even if it turns out not to be lawful the County defendants were entitled to rely on that order because they had no reason to doubt its legality. It's kind of like a United States v. Leon situation where you have good faith reliance by a police officer on a warrant that turns out to be invalid because it was issued based on an affidavit that was insufficient. As long as that officer didn't know about the insufficiency any evidence he sees is pursuant to the warrant isn't subject to suppression based on his good faith reliance on the warrant. This is a good faith situation also because they had no reason to doubt that Chief Foley had the authority to condemn the house or that he was doing it lawfully. So at that point they were able to enter the house that didn't have an expectation of privacy attached. The second basis for prong one affirmance your honors is the exigent circumstances established under the Siebert decision of this court where a officer perceives that an animal was in imminent peril and there's no time to get a warrant they may make a warrantless entry in order to rescue the animal. That's what we had in this case 37 cats in a house with poor air quality so poor that the Chief Foley required his firefighters to go in with self-contained breathing apparatuses and the animal services officers could only stay in there momentarily without running out to get fresh air. Also a lack of food and water due to that the house was condemned. These were exactly the opposite circumstances where this court held there was no exigency of this type in the Siebert case because the livestock in that case did have access to fresh air water and food. So the second prong one justification for affirming here is the exigent circumstances under Siebert and we'd urge the court to so fine. This is because it supports the dismissal of the Monell claim under the rationale often that the case of the United States the LRV Los Angeles is cited for no underlying constitutional violation no Monell liability. But we would argue further judge that even if this court were to find that there was some fourth amendment violation by the county defendants that the fourth the Monell claim still fails because Stacy Director Stacy was not a final decision maker that combined the county under Monell for her decision to make a warrant in century. The statutes and the Illinois state statute and the Winnebago County ordinances we've set forth in our brief show that the state's attorney as the chief law enforcement officer for the county with the duty to advise other officers is in fact final decision maker on warrantless entries and seizures not Stacy Director Stacy of the animal services. So did she make the decision of course but she can't bind the county under the now she's not a final decision maker. So those two reasons the Monell claim was properly dismissed and this court may affirm on either or both well I guess not both because one requires a constitutional violation and the other doesn't. Another point of clarification with respect to the Monell claim in the reply brief the appellant claims that the county defendants did not specifically deny the allegation that Jennifer Stacy was a final policy maker and she cites the ECF document 36 for that proposition. ECF document 36 is the answer of the loves park defendants not the county defendants. Our answer was ECF document 42 and at page 17 paragraph 106 the county defendants specifically deny that Jennifer Stacy was a final policy maker with regard to the county. Another point moving on to the sui sponte nature in which the court ruled in favor of the county defendants. The plaintiff calls this in his last contention on appeal manifestly unjust and cites 2010 case law in support of that. In the county defendants appellees brief we responded by citing federal rule of civil procedure 56f which allows specifically allows for the city to respond to a procedure and in the plaintiff's reply brief she doesn't address 56f at all. Makes no argument that 56f was somehow inappropriate or that the district court made a mistake in applying 56f so that issue is conceded on appeal. Putting that concession aside there was no impropriety with the 56f directive in this case to the plaintiff to show cause why the county defendants shouldn't have summary judgment for the similar reasons as were granted for the loves park defendants. Adequate time was given as evidenced by the 14 page response plaintiff filed. All issues were squarely before the court when that rule when that show cause order entered because as your honors know once qualified immunity is raised and it was raised by all the defendants in their it's incumbent the burden shifts to the plaintiff to establish both prongs of the qualified immunity analysis that her fourth amendment rights were violated and that those rights were clearly established at the time. So she was put on notice that qualified immunity was in play and at that point she should have marshaled all her arguments and all her evidence in order to sustain those claims. I see my time is up and for the reasons stated here this morning and for those in our brief we would ask this court to affirm the district court's judgment. Thank you. Thank you Mr. Drinkwine. Mr. Fink I'll give you another minute in addition to the 30 seconds. Thank you your honor. I won't belabor the point regarding the first issue regarding the initial search aside from the fact that there are two things that the officers should have determined whether one whether there was an emergency and two where the emergency was. If this is a case where the person reporting the emergency specifically said that the emergency was at x and they went to y and it in cases where that is an emergency that's a significant you know distinction. Had she actually been in need of medical care they completely ceased any efforts to actually locate the plaintiff and determine that she was safe after they'd learned about the fact that there were all these cats inside the house. In fact there's testimony that Rosalie Eads initially told Alton that she believed there were 100 cats or so inside the Loves Park house and it appears after he learned that information all thoughts about where plaintiff was and whether she was safe went out the window. Regarding the seizure of the house opposing counsel's argument is squarely focused on the facts and facts that are in dispute here. Joan Klarner was at the house several hours before the search and Klarner and her husband who was a veterinarian specifically said that they didn't believe that the odor was so overwhelming that they needed to ever go outside. They thought the conditions of the cats were completely humane and and safe. These are people who raise and breed cats now as hobbyists and and in great esteem in that community. The key in issue in this case your time has expired. Thank you your honor. Thank you. Thanks to all counsel and the case is taken under advisement.